A03A2292. WATSON v. WILLIAMS TRAVELCENTER, INC.
(593 SE2d 908)

PHIPPS, Judge.

Michael Watson was injured after he slipped and fell in a puddle of diesel fuel at Williams Travelcenter (WT), a fueling station. He sued WT, alleging that it had breached a duty to maintain its premises in a safe condition. The trial court granted summary judgment to WT, ruling that Watson had actual knowledge of the fuel on the ground, but that WT lacked actual or constructive knowledge of the fuel. Watson appeals, but we affirm.

On the afternoon of November 7, 1999, Watson drove to WT in his 18-wheeler truck, which has fuel tanks on both sides. He parked the truck at an island with dual diesel fuel pumps and began filling

---

[9] Id.

[10] See *Taylor v. State*, 272 Ga. 744, 747 (2) (534 SE2d 67) (2000).

[11] *Marshall v. State*, 275 Ga. 740, 743 (5) (571 SE2d 761) (2002).

the tank on the driver's side. Next, he began filling the tank on the passenger's side, then returned to the driver's side. He saw no fuel on the ground on either side of the truck.

The tank on the driver's side filled, and the pump shut off automatically. Watson began walking back to the passenger side, heard a clanging noise, and saw that "the nozzle had jumped out of the fuel tank and hit the ground" and fuel was spewing onto the ground. Because he feared a fire hazard and because he would have to pay for any wasted fuel, Watson quickly moved to turn off the pump. He slipped on the spilled fuel, fell, and broke his wrist.

After he fell, Watson "looked around for help" but saw no one. He got up, walked inside the truck stop, and reported his fall to the cashier. The cashier summoned the assistant manager, Terresa Story, who testified that Watson told her that "the nozzle pump popped out of his truck and he was running to try to shut it off and slipped. . . ." Story immediately inspected the fuel island, saw approximately two to three gallons of spilled diesel fuel on the ground, and blocked off the area for cleaning.

During his deposition, Watson was asked his opinion about why the nozzle popped out. He responded: "When the [driver's side] pump stopped pumping, it [threw] all the pressure to the passenger's side nozzle, and the pressure pushed [the nozzle out]." He admitted, however, that he had no expertise in fuel pumps, that he did not examine the pump or nozzle in question, and that he had no information that there was anything wrong with them.

In her deposition, Story testified that she was aware that nozzles could pop out of fuel tanks and that she occasionally had received complaints about nozzles popping out. In her experience, this phenomenon occurs because the driver has not inserted the nozzle fully into the fuel tank. Story testified that when she receives a complaint of a nozzle popping out, she watches the next customer fueling at the island to make sure the nozzle is operating properly. After the island where Watson had fueled was cleaned up, Story asked a maintenance worker to watch the next two customers at that island. No nozzle malfunction was found, and no other customers complained about the nozzle or pump in question.

Another WT employee, compliance coordinator Kenneth Whatley, testified that he also was aware that nozzles could pop out of fuel tanks. He further testified that if a nozzle "comes out of the tank and hits the ground, it shuts off unless it had a foreign material shoved up under the handle to keep it latched in place." Whatley explained that customers sometimes jam screwdrivers, sticks, or fuel caps into the nozzle's handle to "keep it running."

Watson submitted an affidavit from James Shackleford, who averred that one day in the fall of 1999 he was fueling his dual-tank

tractor-trailer at WT. According to Shackleford, the fuel dispenser on the passenger's side shut off automatically, and then the dispenser on the driver's side popped out suddenly, spewing fuel all over Shackleford and his son. Shackleford, however, did not report this incident to WT.

WT sought summary judgment on the grounds that it lacked superior knowledge of the hazard and that Watson had assumed the risk of his injuries. The trial court granted the motion.

1. "The mere showing of the occurrence of an injury does not create a presumption of negligence" on the part of a proprietor.[1] Rather, the proprietor is liable for negligence if he had superior knowledge of the hazard that caused the injury and of the danger associated with the hazard.[2] Thus, to prevail in a slip and fall case, an invitee must prove (1) that the proprietor had actual or constructive knowledge of the hazard and (2) that the invitee lacked knowledge of the hazard, despite the exercise of ordinary care, due to actions or conditions within the proprietor's control.[3]

Watson claims that WT had both actual and constructive knowledge of the hazard in this case — fuel spewing from a faulty nozzle. We disagree.

(a) There is no evidence that WT had actual knowledge of the nozzle popping out of his tank or of the fuel spillage. Watson testified that there was no fuel on the ground before he began using the pumps and that he slipped almost immediately after the nozzle popped out and fuel began spilling on the ground. Thus, as WT points out in its brief, it could not have had knowledge of this "instantaneous hazard."

Watson argues, however, that WT did have actual knowledge that nozzles could pop out of fuel tanks, causing fuel to spill. Essentially, Watson contends that the hazard resulted from a latent defect in WT's fueling apparatus of which WT was aware. But the record evidence cited by Watson fails to support this theory.

Watson points to the testimony of Story and Whatley, who both acknowledged that they knew nozzles could pop out of fuel tanks. Story, however, explained that in her experience this happens only if a driver has failed to insert the nozzle fully into the fuel tank. Whatley was not asked for, and did not give, an explanation for the phenomenon. Thus, although the evidence shows that WT knew nozzles could pop out, it thought the problem resulted from customer error, rather than from defective equipment.

Watson also points out that WT knew that when nozzles did pop

---

[1] *Haskins v. Piggly Wiggly Southern*, 230 Ga. App. 350, 351 (496 SE2d 471) (1998).
[2] Id.
[3] *Robinson v. Kroger Co.*, 268 Ga. 735, 748-749 (493 SE2d 403) (1997).

out, fuel would spill onto the ground. Story did testify that a nozzle popping out inevitably results in some fuel spillage, but she also stated that the nozzles "usually" turn off when they hit the ground. She testified that she knew of one other occasion when a nozzle had failed to turn off after hitting the ground, but she said that that incident had occurred at a different fueling station, and she did not specify whether it had happened before or after Watson's incident. Whatley testified that when nozzles hit the ground, fuel stops spilling unless the customer has shoved a foreign object under the handle. The hazard here allegedly resulted not from brief spillage after the nozzle was dislodged from Watson's tank, but from continued spillage that prompted Watson to step into a large accumulation of fuel to turn off the pump. There is no evidence that WT knew that its pumps could continue to discharge fuel after the nozzle hit the ground, in the absence of deliberate manipulation of its equipment by the customer.

Finally, Watson points to Shackleford's affidavit. But because Shackleford never reported his incident to WT, his affidavit cannot demonstrate WT's actual knowledge.

(b) There also is no evidence that WT had constructive knowledge of the alleged hazard. Constructive knowledge may be shown through evidence that either (1) an employee of the proprietor was in the immediate vicinity and could easily have seen and removed the hazard; or (2) the proprietor failed to exercise reasonable care in inspecting the premises.[4]

Watson attempts to prove constructive knowledge through the second method, arguing that WT's employees failed to follow the company's written and verbal inspection procedures on the day in question. But even if that were true, Watson has failed to show that a reasonable inspection would have revealed any problem with the fueling equipment he used.[5] Story testified that maintenance workers watched the next two customers fueling at that island and neither saw any problems with nor received any complaints about the equipment. And Watson, himself, admitted that he had no information that anything was wrong with the pump.

In short, Watson's theory that the hazard resulted from some alleged defect in the equipment that WT either knew about or could have discovered through reasonable inspection finds no support in

---

[4] See *Kull v. Six Flags Over Ga. II*, 254 Ga. App. 897, 900 (2) (564 SE2d 747) (2002), rev'd on other grounds, *Six Flags Over Ga. II v. Kull*, 276 Ga. 210 (576 SE2d 880) (2003).

[5] See *Hardee's Food Systems v. Green*, 232 Ga. App. 864, 867 (2) (b) (502 SE2d 738) (1998) (constructive knowledge not shown where alleged hazard was invisible and would not have been discovered through reasonable visual inspection).

the record. Accordingly, the trial court properly granted summary judgment to WT.[6]

2. In light of our ruling in Division 1, we need not consider Watson's argument that he did not assume the risk of his injuries.

*Judgment affirmed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED JANUARY 30, 2004.

*Eastman & Apolinsky, Stephen D. Apolinsky*, for appellant.

*Swift, Currie, McGhee & Hiers, Pankaj K. Shere, Charles B. Marsh*, for appellee.

---

[6] See *Higgins v. Food Lion*, 254 Ga. App. 221, 223 (561 SE2d 440) (2002) (summary judgment was properly awarded to proprietor where invitee presented no evidence that proprietor had actual or constructive knowledge of hazard).